# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

**MARK ALLEN TOMBLIN,**

     **Plaintiff,**

**vs.**                                 **CIVIL ACTION NO. 3:16-CV-04255**

**NANCY A. BERRYHILL,[1]**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security dying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered May 9, 2016 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 14 and 17.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **GRANT** Plaintiff's request for judgment on the pleadings (Document No. 14.), **DENY** Defendant's request to affirm the

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

decision of the Commissioner (Document No. 17.); **REVERSE** the final decision of the Commissioner and **REMAND** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g); and **DISMISS** this action from the docket of the Court.

## Procedural History

The Plaintiff, Mark Allen Tomblin (hereinafter referred to as "Claimant"), protectively filed his application for Title II benefits on December 12, 2013, and his application for Title XVI benefits on December 19, 2013, alleging disability beginning March 12, 2013 due to "back injury, bulging discs, hyperglycemia, anxiety, and headaches".[2] (Tr. at 289.) His claims were initially denied on May 28, 2014 (Tr. at 137-149.) and again upon reconsideration on September 17, 2014. (Tr. at 151-157, 158-164.) Thereafter, Claimant filed a written request for hearing on October 24, 2014. (Tr. at 165-166.) An administrative hearing was held on October 5, 2015 before the Honorable Maria Hodges, Administrative Law Judge ("ALJ"). (Tr. at 45-82.) On October 30, 2015, the ALJ entered a decision finding Claimant was not disabled. (Tr. at 20-44.) On December 30, 2015, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 18-19.) The ALJ's decision became the final decision of the Commissioner on March 2, 2016 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6.) On May 6, 2016, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) In response, the Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 11 and 12.) Subsequently, Claimant filed a Brief in Support of Motion for Judgment on the Pleadings (Document No. 14.), and in response, the Commissioner filed a Brief in Support of Defendant's Decision. (Document

---

[2] In his Disability Report – Appeal, submitted on June 30, 2014, Claimant alleged that since his last Disability Report dated December 16, 2013, he alleged that his "[p]ain has worsened. Migraines have worsened." (Tr. at 316.)

No. 17.) Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 49 years old when the ALJ determined he was not disabled; he would be defined as a "younger person" by the Regulations on the date last insured ("DLI"). See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 51.) Claimant graduated high school and served in the United States Army. (Tr. at 51, 53.) Claimant alleged disability as of March 12, 2013 when he fell out of the back of a truck while working as a long-haul truck driver. (Tr. at 53.) He attempted to return to work after this incident, however, the ALJ deemed it was an unsuccessful attempt. (Tr. at 25.) During the fifteen years prior to his alleged onset date, Claimant had only been working as a long-haul truck driver. (Tr. at 56-57.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1

to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those sections provide as follows:

(c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and

how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through March 31, 2019. (Tr. at 25, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since March 12, 2013, the alleged onset date. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: degenerative disc disease; diabetes mellitus with neuropathy; syncope; migraines; obesity; and adjustment disorder with depressed mood. (Id., Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart

P, Appendix 1. (Tr. at 26, Finding No. 4.) The ALJ then found that Claimant had the residual

functional capacity ("RFC") to perform light work as defined in the Regulations

> except he may never climb ladders, ropes, or scaffolds; occasionally climb
> ramps/stairs; frequently balance, stoop, kneel, crouch, and crawl; should avoid even
> occasional exposure to hazards; should avoid concentrated exposure to temperature
> extremes, wetness, and vibration; can finger frequently with the right dominant
> hand; and can understand, remember, and carry out simple instructions. (Tr. at 28,
> Finding No. 5.)

At step four, the ALJ found that Claimant was incapable of performing his past relevant

work. (Tr. at 36, Finding No. 6.) At the fifth and final step, the ALJ found that Claimant was 46

years old on the alleged onset date, making him a younger individual; that he had at least a high

school education and able to communicate in English; that the transferability of job skills was

immaterial to the determination of disability because the Medical-Vocational Rules support a

finding of "not disabled" and that based on his age, education, work experience, and RFC, there

are other jobs that exist in significant numbers in the national economy that Claimant can perform.

(Id., Finding Nos. 7-10.) The ALJ determined that Claimant had not been under a disability from

March 12, 2013 through the date of the decision. (Tr. at 37, Finding No. 11.)

**Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the ALJ improperly evaluated the psychological opinion provided by

Dr. Stephen W. Halmi when she gave his opinion little weight – Claimant contends that Dr.

Halmi's evaluation was not simply a report of Claimant's symptoms, but a clinical interpretation

of the signs of mental illness. (Document No. 14 at 6-7.) Further, Claimant contends that the ALJ

failed to explain the reason for the little weight she gave Dr. Halmi's opinion, especially where it

had consistencies with Dr. Michelle Hudson's January 2016 opinion.[4] (Id. at 7.) Next, Claimant argues the ALJ failed to consider all the medical opinion evidence as required under the Regulations and SSR 96-5p, specifically, the psychological opinion provided by Dr. Raymond Richetta, that he had moderate impairments in his social functioning and concentration, persistence and pace, which was corroborated by Claimant's treating psychologist. (Id. at 8.)

Finally, Claimant asserts that the RFC does not address his limitations appropriately, as the ALJ only accommodated his mental impairment to understanding, remembering and carrying out simple instructions. (Id. at 9.) The ALJ did not explain why these additional limitations were excluded from the hypothetical question posed to the vocational expert. (Id.) Moreover, the ALJ did not fairly accommodate Claimant's right wrist limitations when she only restricted him to frequent fingering with his right hand. (Id.) In closing, Claimant requests this matter be reversed and remanded in order to correct the errors aforesaid. (Id. at 10.)

In response, the Commissioner asserts that the ALJ's evaluation of Dr. Halmi's opinion is supported by substantial evidence and that she provided several reasons in her explanation for the weight given: it was inconsistent with the overall medical record as well as with Claimant's travels and activities of daily living, and the ALJ was entitled to discount the opinion specifically to the extent that it was based on Claimant's subjective complaints.[5] (Document No. 17 at 15-18.)

With regard to the ALJ's treatment of Dr. Richetta's opinion, the Commissioner argues

---

[4] Dr. Hudson, of Marshall University School of Medicine, performed a Neurobehavioral Status Examination on January 20, 2016 at Claimant's self-referral. (Tr. at 7-10.) However, it appears that this evidence was submitted by Claimant after the administrative hearing, and was not considered by the Appeals Council. The only additional evidence considered by the Appeals Council after the ALJ's decision was issued was office records from Marshall Family Medicine, dated October 26, 2015, identified in "AC Exhibits List" as Exhibit 40F. (Tr. at 1386-1388.)

[5] See, Cook v. Colvin, No. 15-7181, 2016 WL 5661348, at *5 (S.D.W.Va. Sept. 29, 2016) (affirming the ALJ's finding that a medical opinion was entitled to lesser weight because it was based largely on the plaintiff's own subjective complaints) (internal citations omitted). (Id. at 16.)

that he performed an evaluation of Claimant for purposes of his workers' compensation claim, and that he completed the exact same form as Stephen Wilcox, M.D. and Jason R. Southall, PA-C[6] completed over a year earlier. (Id. at 18.) The Commissioner adds that the only difference between the two forms was that Dr. Richetta opined Claimant had moderate restrictions in social function and adaption, whereas Dr. Wilcox opined he had mild limitations. (Id. at 19.) The ALJ gave slight weight to Dr. Wilcox's opinion because it was based on Claimant's subjective reports of symptoms that were not documented in the medical records. (Id.) Furthermore, Dr. Richetta's opinion was applicable only to the period from April 16, 2014 through October 16, 2014. (Id.) The Commissioner contends that there is no reasonable basis to conclude that the ALJ's determination would have changed had she weighed Dr. Richetta's opinion; the ALJ's failure to weigh this opinion is harmless error since she accommodated his mental function limitations in the RFC. (Id.)

The Commissioner asserts that the two separate assessments provided by Dr. Froilan were applicable to only limited time periods, from September 16, 201[4] through December 16, 2014 and January 20, 2015 through April 20, 2015, respectively, and that the ALJ weighed the same form completed by Dr. Wilcox. (Id. at 20.) Again, the Commissioner argues there is no reasonable basis to conclude that the more mild findings of Claimant's mental status examinations in the record would have altered her decision. (Id.) In closing, the Commissioner asks the Court to affirm the final decision. (Id.)

## The Relevant Evidence of Record[7]

---

[6] The undersigned notes that the opinions provided by these "Workers' Compensation examiner[s]" cited by the ALJ in her decision (Tr. at 35, 743.) concerned Claimant's physical impairments, and there is no evidence that either Dr. Wilcox or PA-C Southall examined, treated or provided a consulting opinion with respect to Claimant's mental impairments.

[7] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

<u>Records Pertaining to Physical Impairments:</u>

On March 12, 2013, the alleged onset date, Claimant fell out the back of a semi-trailer and twisted his right knee after landing on his foot. (Tr. at 481.) He presented to the emergency room two days later with right knee and low back pain. (<u>Id</u>.) On examination, Claimant was alert and in no acute distress; his back had normal range of motion, normal alignment, no step-offs, and tenderness in the lumbar midline and right lateral thoracic areas. (Tr. at 482.) He was alert and oriented with no focal neurological deficits observed. (<u>Id</u>.) X-rays of his right knee showed no acute bony abnormality or joint effusion and x-rays of his lumbar spine showed normal alignment with no acute fracture and minimal bony lipping of the endplates throughout the lumbar spine. (Tr. at 496.) Claimant was diagnosed with knee sprain and back contusion and given a prescription for Ultram and Ibuprofen. (Tr. at 482-483.) He was released to work with no restrictions as of March 18, 2013. (Tr. at 720.)

On March 16, 2013, Claimant was admitted to Cabell Huntington Hospital with chest pain; it was noted that he "had similar presentations in the past for chest pain." (Tr. at 413.) A CT scan of his chest was negative, an EKG was normal, and a stress test was normal. (Tr. at 413, 428, 438, 443.) An x-ray taken of his thoracic spine showed no fracture or subluxation and no significant arthritic changes. (Tr. at 439.) On examination the following day, Claimant had normal S1 and S2 sounds with a regular rate and rhythm with no murmurs or gallops. (Tr. at 428.) He had no edema in his extremities; he was alert and oriented; and he was cooperative with an appropriate mood and affect. (<u>Id</u>.) Claimant was started on statin for his hyperlipidemia and was discharged the following

day with diagnoses of chest pain, hyperlipidemia, hyperglycemia, and back pain. (Tr. at 410-413.)

On April 8, 2013, Family Urgent Care Center issued a note fully releasing Claimant to return to work that day without restrictions. (Tr. at 766.) On May 8, 2013, Claimant presented to the emergency room with back pain he sustained from his workplace injury in March. (Tr. at 470.) On examination, he was alert and in no acute distress. (Tr. at 471.) His physical examination was largely unremarkable. (Id.) An x-ray of his lumbosacral spine showed normal alignment, normal disc space, no fractures, with no changes noted compared to images taken on March 14, 2013. (Tr. 472, 480.) Claimant was discharged with a diagnosis of back pain with sciatica, and instructed to follow up with his family physician. (Tr. at 477.)

On June 4, 2013, Claimant had an initial evaluation by HPT Physical Therapy Specialists. (Tr. at 580-582.) It was noted that he had fair rehabilitation potential, and that clinical findings were consistent with posterior lumbar derangement. (Tr. at 581.) The day before, when presenting Cabell Huntington Hospital urgent care, an MRI was ordered due to his complaints of low back pain. (Tr. at 760.) On June 10, 2013, Claimant reported that his pain decreased while lying in a hammock and lying in his pool on the pool noodles. (Tr. at 585.) An MRI dated June 11, 2013 showed "a very mild convex right lumbar curvature . . . vertebral alignment otherwise normal." (Tr. at 812, 1011.) Imaging showed "there is mild posterior central annular T1 hyperintensity, which would suggest annular tear." (Id.) The next day, June 12, 2013, Claimant told the physical therapist that he was not compliant with his home exercise program, but would occasionally do "some" exercises. (Tr. at 583.) He reported still having moderate LS pain, and he complained of a minor headache. (Id.) On June 21, 2013, Claimant reported low back pain that "is shooting pain up into his shoulder blades and a headache that is radiating into his eyes . . . [he] states that his

symptoms are unchanged since beginning therapy." (Tr. at 592.) He advised that he was leaving that weekend to visit his daughter in London and would return to physical therapy the following week. (Id.) During a therapy session on June 28, 2013, Claimant rated his pain at 3-4/10 at rest, but it increased to 8/10 "especially in b/t shoulder blades with" therapeutic exercises. (Tr. at 595-596.) It was noted that "Pt will be out of the country next week." (Tr. at 596.)

On July 12, 2013, Claimant cancelled his physical therapy appointment because he was in the pool with his granddaughter. (Tr. at 611.) On July 17, 2013, Claimant returned to physical therapy and rated his pain as a three on a ten-point scale. (Tr. at 618.) On July 19, 2013, he reported that he had no pain in his back. (Tr. at 615.)

On August 29, 2013, Claimant was seen by Robert Marsh, M.D. at Marshall Health University Physicians and Surgeons complaining of foot pain, low back pain and neck pain that radiated from his left nape of his neck to the superior nuchal line, and that his lumbar spine "is slightly worse than his neck pain, but both are present." (Tr. at 572.) Claimant denied radiculopathy, numbness, or tingling. (Id.) On examination, Claimant was oriented with appropriate speech; his cognition was intact; his cranial nerves were intact; he had full strength (5/5) in all extremities; and his sensation was intact to light touch, pain, temperature, and proprioception. (Tr. at 573.) His gait was normal and tandem. (Id.) Claimant had point tenderness along the bilateral paraspinal muscles of the lumbar spine and along his left trapezius muscle. (Id.) Dr. Marsh reviewed an MRI of Claimant's lumbar spine that demonstrated "very, very mild" L4-L5 degenerative disk disease, but good alignments and no neural foraminal stenosis. (Id.)

Dr. Marsh diagnosed Claimant with cervical neck pain and low back pain related to muscle strain/tear and not related to any form of central neurological pathology resulting from

12

compression of the cord. (Id.) Dr. Marsh ordered a TENS unit for muscle stimulation to help with Claimant's rehabilitative process and continued physical therapy. (Id.) He also ordered a pain referral for trigger point injections and told Claimant he could follow up with him on an as-needed basis. (Id.) However, a record dated September 13, 2013 from Cabell Huntington Hospital indicated that Claimant "would prefer not to do injections, if possible." (Tr. at 750.)

On October 28, 2013, Claimant was referred by the Ohio Bureau of Workers' Compensation to Steven A. Cremer, M.D. of North Star Orthopaedics for a 90-day evaluation. (Tr. at 575-579.) The "Allowed conditions in this claim" were: contusion of right knee; sprain of left knee and leg, NOS; back contusion; lumbosacral sprain; and annular tear. (Tr. at 575-576.) It was noted that Claimant was under the care of Dr. Wilcox and PA-C Southall. (Tr. at 576.) It was also noted that Claimant had a home exercise program and walked 2-3 blocks at a time. (Id.) Claimant was complaining of headaches, back pain, hip pain and muscle spasm. (Id.) He rated his pain level at 6-8/10 and that it was constant.  (Id.) He was using physical therapy, a heating pad and rest to help with the pain. (Id.) Dr. Cremer noted that Claimant was alert and cooperative throughout the examination and that his gait was normal and he could get on and off the exam table independently. (Tr. at 577.) Dr. Cremer opined that Claimant had reached maximum medical improvement, and that he declined vocational services such as a work conditioning program and Functional Capacity Evaluation and was engaged in college courses. (Tr. at 578.)

On November 5, 2013, Claimant left physical therapy early to sleep because he had to work on a paper that was due the following day. (Tr. at 676.) On November 22, 2013, Claimant's workers compensation benefits were suspended and he was discharged from physical therapy (Tr. 681).

On December 10, 2013, the Ohio Bureau of Workers' Compensation closed his vocational rehabilitation file due to settlement of his claim. (Tr. at 743.) It was noted that Claimant was released to frequent lifting and carrying up to 20 pounds and continuously up to 10 pounds; he was also attending Marshall University and had enrolled for a second semester. (Id.) He received financial aid for his tuition and books, and his vocational goal was to become a History School Teacher. (Id.)

On January 30, 2014, Claimant returned to Cabell Huntington Hospital Urgent Care with increased back pain. (Tr. at 745.) He reported that his pain was worse and that he could not sit or stand for five minutes without pain in his back. (Id.) On February 19, 2014, Claimant saw Ronald LeMaster, D.O., for headache and progressive memory loss, as well as abdominal pain and epigastric and right upper quadrant pain. (Tr. at 1066.) Dr. LeMaster started Claimant on Prilosec and ordered an ultrasound of his right upper quadrant. (Tr. at 1067.) Dr. LeMaster also ordered a prescription for Naprosyn for his headaches. (Id.) The ultrasound of Claimant's abdomen due to his complaints of lower quadrant pain showed a normal gallbladder. (Tr. at 1013.)

On March 5, 2014, Claimant presented to Cabell Huntington Hospital with complaints of pain in both feet and ankles that had persisted for months. (Tr. at 1064.) He was diagnosed with plantar fascitis. (Tr. at 1065.) On March 13, 2014, Claimant returned to Cabell Huntington Hospital complaining that his hands and feet go numb, usually when he was seated; he reported that he has had these symptoms for years. (Tr. at 1062.) EMG testing was ordered. (Tr. at 1063.) That same day, Claimant saw Dr. Marsh for follow up on his cervical and back pain. (Tr. at 1053.) On examination, Claimant was oriented; his speech was appropriate; his cognition was intact; his cranial nerves were intact; and his motor strength was full in all four extremities. (Tr. at 1054.) Dr.

Marsh noted that Claimant's gait remained somewhat antalgic and he walked bent over, but his cerebellar exam was without dysmetria. (Id.) Dr. Marsh noted Claimant did not receive the trigger point injections he recommended and that Workers' Compensation was unable to continue with Dr. Marsh's recommendations. (Tr. at 1055.) Dr. Marsh ordered an MRI of his cervical spine so that he could assess whether there was any significant injury in terms of disk degeneration or herniation. (Id.)

On March 20, 2014, Claimant reported he had lower back pain with stabbing knife pain in both soles and difficulty to stand or walk, and that leaning forward makes it better. (Tr. at 1060.) He also complained of stiffness upon resting and admitted he had lower extremity swelling upon prolonged sitting and that he was known to have poor circulation. (Id.) He advised that he was not taking tramadol. (Id.)

On April 9, 2014, the MRI of Claimant's cervical spine showed no acute abnormality but uncovertebral and mild facet hypertrophy at C5-6 with only mild neural foraminal stenosis. (Tr. at 1051.) On April 29, 2014, Claimant returned for a follow-up with Dr. Marsh with the EMG results indicating "only very mild, right-sided carpal tunnel syndrome and no other significant radicular findings on the MRI results." (Tr. at 1046-1047.) Dr. Marsh recommended that Claimant follow up with one of the neurologists for continued assessment for his headaches. (Tr. at 1047.) Dr. Marsh opined that Claimant's examination "was not consistent with a cervical neck strain and likely that cervical neck strain had likely resolved" (Id.) He further noted that Claimant could follow up with him on an as-needed basis for new changes, but "I find no neurological symptoms nor any physical findings that support his neck strain." (Id.)

On April 14, 2014, Claimant saw Paul Ferguson, M.D. at Dr. Cremer's referral for

numbness and pain in his limbs. (Tr. at 1048.) Nerve Conduction studies in both arms were "abnormal" with "evidence of median mononeuropathies at the level of the wrist with the right side being graded at mild severity." (Id.) On May 16, 2014, Claimant saw Dr. Ferguson again, but for evaluation of his headaches. (Tr. at 1042.) On examination, Claimant was well-nourished, well-hydrated, and in no acute distress. (Tr. at 1043.) He was alert, oriented, and cooperative; his recent and remote memory were normal; his attention span and concentration were normal; his speech was clear and his language was normal; and his fund of knowledge was normal. (Id.) His visual fields were intact to confrontation and funduscopic examination was without optic disk pallor or edema. (Id.) Claimant's retinal vessels were normal; his pupils were equal and reactive to light; his facial sensation was normal without weakness; his auditory acuity was grossly normal; and he had normal stemocleidomastoid and trapezius strength. (Id.) Claimant's muscle strength was full and his muscle tone and bulk were normal in the upper and lower extremities. (Tr. at 1044.) His reflexes were 2+ and symmetric in all four extremities; his sensation was intact; and his gait was normal. (Id.) Dr. Ferguson diagnosed common migraine without aura and initiated Topamax and Sumatriptan for migraine onset. (Id.)

Claimant was evaluated by Jimmy H. Blanton, D.C. on June 6, 2014 for his "migraines, constant pain in his frontal lobe; stiffness and pain in his neck that radiated down to both arms, with numbness and tingling; pain in both shoulder blades, more in the left shoulder; pain in his lower back that radiated down into both legs with numbness and tingling; and pain in both his ankles and feet." (Tr. at 1099-1108.) Claimant was most concerned with his headaches. (Tr. at 1102.) He was also unable to bend at all due to pain. (Tr. at 1107.) It was noted that he was unable to get out of any chair without assistance and pain, able to stand 5 minutes without pain, able to sit

1 hour before having pain, and able to walk 10 feet. (Tr. at 1108.) He reported constant headaches. (Id.) Throughout June 2014, Claimant had six sessions with Chiropractor Blanton. (Tr. at 1099-1122.)

Claimant presented to the Cabell Huntington Hospital Emergency Department on June 15, 2014 for leg and arm pain and numbness after exercising the day before. (Tr. at 1075.) On exam, he had normal range of motion, normal strength, no swelling, no deformity, and his bilateral quadriceps region was mildly tender to palpation. (Tr. at 1077.) Claimant was diagnosed with muscle strain, given prescriptions for Norco and Robaxin, and instructed to follow up with his primary care provider. (Tr. at 1078, 1096.)

In July 2014, Claimant was seen by Amy Sieweke, NP-C at Marshall Neuroscience for headaches as well as cervicalgia. (Tr. at 1128-1138.) It was also reported that he never got to the maximum dosing of the Topamax as recommended by Dr. Ferguson, and that his primary care physician recommended that he only take the Topamax once at bedtime. (Tr. at 1134.) An MRI of Claimant's brain was ordered due to his complaints of bilateral leg weakness and migraine as well as an MRI of his lumbar spine. (Tr. at 1137.) He was assessed with having common migraine without aura, neuropathy, numbness in both legs and bilateral leg weakness. (Id.)

Ms. Sieweke advised Claimant that he had a non-surgical spine as he had non-dermatomal pain and no myelopathic signs. (Tr. at 1138.) She explained that abnormal curvature of the spine of the neck is usually due to muscle spasm and the best route is to consider conservative therapy, such as massage therapy and physical therapy. (Id.) She advised that Claimant could also use heat/ice and gentle stretching, and could use a wrist splint for his arm numbness and tingling. (Id.)

For his lower extremities, the EMG was negative, however, a lumbar MRI was ordered to

17

assess for changes in his spine. (Id.) She noted that Claimant had no dermatomal pain and no clonus, no saddle anesthesia or incontinence and, therefore she highly suspected that there was no central cord issue. (Id.)

For his headaches, Ms. Sieweke stated that it was imperative that Claimant stick to the recommended dosing of his medication if he wanted Dr. Ferguson to treat his headaches. (Id.) An MRI of his brain was also ordered at Claimant's request. (Id.) It was recommended that he should take the medication as prescribed by Dr. Ferguson and he should more slowly increase Topamax to the recommended dosage. (Id.)

On September 5, 2014, Claimant returned to see Dr. Ferguson for a follow-up for his headache and other neurological complaints. (Tr. at 1123.) Claimant reported that he never got to the maximum dosing of Topamax as recommended, and stated that he was taking Ibuprofen daily "at first, but then changes his story that he takes it only on the weekend to make sure he can make it through the day." (Id.) Claimant also reported having recurrent blackout spells that occurred on multiple occasions and lasting a few seconds. (Id.) Claimant indicated two of these episodes have occurred while driving, and one time "was pulled over by the police in Kentucky for suspected DUI." (Id.) A mental status examination revealed that Claimant was alert and oriented to all three spheres, and that he was cooperative and follows commands well. (Tr. at 1126.) Dr. Ferguson noted that his recent and remote memory were normal; his attention span and concentration were normal; his speech was clear and language was normal; his fund of knowledge was also normal. (Id.) His physical examination was unremarkable, other than he reported decreased sensation in the bilateral lower extremities to light touch. (Id.) His gait was normal, although he had pain on standing and with walking in his lower back. (Id.)

18

Dr. Ferguson assessed Claimant with common migraine without aura and found the recent advent of episodes of transient alteration concerning for syncope. (Id.) Dr. Ferguson ordered an echocardiogram and EKG for his syncope, and he changed Claimant's dosing of Topiramate. (Id.)

On September 14, 2014, Claimant was seen at Cabell Huntington Hospital Emergency Room for a headache and for a recent episode of "blacking out"; he also suspected he stopped breathing during the night because he woke up gasping and that this had been ongoing for years. (Tr. at 1145.) He was discharged that day with a diagnosis of headache and advised to follow up with his primary care physician. (Tr. at 1161.)

On October 10, 2014, Claimant underwent an MRI of his brain that was unremarkable (Tr. at 1206.) and on October 28, 2014, he had an echocardiogram that was normal. (Tr. at 1201.) However, a sleep study taken on October 10, 2014 showed a mild obstructive sleep apnea on October 10, 2014. (Tr. at 1205.)

On November 21, 2014, Claimant had a follow-up appointment with Dr. Ferguson for his continued headaches and transient alterations in awareness. (Tr. at 1215-1218.) Dr. Ferguson noted that Claimant's cardiac work-up and brain MRI were both negative, therefore, he would order an EEG and event monitor. (Tr. at 1218.)

Claimant was seen again on February 2, 2015 at the Emergency Room for migraine headache with an onset of two days prior and chronic. (Tr. at 1167.) He was discharged that same day with prescriptions and advised to follow up with his primary care provider. (Tr. at 1182.) That same day, Claimant saw Jennifer Fields, APRN, for a follow up for headaches and spells of alteration of awareness. (Tr. at 1209.) She noted that since his last office visit in November, Claimant had not had the EEG as requested by Dr. Ferguson. (Id.) Claimant reported that he

continued to have difficulty with short term memory as well as spells in which he "blacks out" and then falls asleep. (Id.) She ordered another EEG and neuropsychological testing due to his complaints of "cognitive fog". (Tr. at 1214.) On February 10, 2015, Claimant had an Electroencephalogram that revealed no abnormalities in the awake and sleep states. (Tr. at 1200, 1207-1208.)

On February 27, 2015, Claimant saw Ronald M. LeMaster, D.O., for weakness and numbness in his arms and legs, headaches, and an inability to focus. (Tr. at 1222-1223.) It was noted that he had headache medicine but is noncompliant with most of his medicines. (Tr. at 1222.) On examination, Claimant was alert and oriented with a flat affect. (Tr. at 1223.) His cranial nerves were grossly intact and his deep tendon reflexes were normal. (Id.)  His grip strength was weaker on the right, but Dr. LeMaster was "not too sure the patient was not malingering." (Id.) With respect the paraesthesias in his extremities, Claimant stated that he had lost confidence in Dr. Ferguson and his ability to treat what is going on. (Id.)

Dr. LeMaster concluded that he was "not sure whether the patient's problems are somatic in nature and would like a second opinion and a workup from a larger facility." (Id.) Dr. LeMaster concluded that he would continue the treatment plan that Dr. Ferguson had in place without changing. (Id.) Regarding Claimant's right-sided weakness, Dr. LeMaster wrote that Claimant "has had CT scans, MRIs, and numerous workups. I do not know what the cause of his right-sided weakness is and, like I said, in my physical exam, I am not too sure that he was not malingering during the grip strength test and would like somebody else to test and advise." (Id.)

On April 15, 2015, Claimant went to the emergency department again for a headache and dizziness with vertigo that had persisted "for more than one week." (Tr. at 1224.) His physical

examination was unremarkable. (Tr. at 1226.) He was later discharged with a headache diagnosis and instructed to take Ibuprofen or Tylenol as needed and follow up with his medical providers. (Tr. at 1227.)

On August 20, 2015 Claimant was again seen at Marshall Neurology by Dr. Cremer for headaches. (Tr. at 1332-1334.) Dr. Cremer opined that Claimant's headaches were "likely exercise induced" and noted that Claimant does not take his Topamax regularly due to memory issues while taking it. (Tr. at 1334.) He gave Claimant trial propranolol prior to exercise and advised to discontinue it if any adverse reactions. (Id.) Dr. Cremer advised that he set up another appointment with his neurologist. (Id.)

On October 5, 2015, Claimant saw Kelly Chapman, NP-C, at Cabell Huntington Hospital for his migraines, neck pain, and chronic low back pain. (Tr. at 1381-1384.) His physical examination was unremarkable (Tr. at 1383.), however, she referred him to physical therapy and a neurologist because he stated that he no longer was going to Dr. Ferguson after having an argument with the receptionist. (Tr. at 1381.)

Records Pertaining to Mental Impairments:

On April 16, 2014, Raymond D. Richetta, Ph.D., performed a psychological evaluation of Claimant in relation to his workers' compensation claim. (Tr. at 1246-1252.) Upon arrival, Claimant was "talkative and superficially friendly." (Tr. at 1246.) "He smiled and laughed. When he laughed, he grabbed his chest and said, 'That hurts . . from my back and into my head.'" (Id.) He admitted that he tried to project a positive image, but he was depressed. (Id.) He reported missing golf, but stated that he could still putt. (Tr. at 1247.) He endorsed feeling bored and being depressed, which made him drink a lot more. (Id.) He also described having no appetite for regular

meals but almost compulsively eating cake and was socially unmotivated. (Id.) Claimant reported that his problems started when he was injured on the job. (Id.)

On examination, Claimant was alert and there were no indications of a loss of awareness. (Tr. at 1250.) He reported being quick-tempered and stated he was depressed more days than not. (Id.) He was recently depressed after Christmas because he was sitting at home and was used to being gone working driving his truck to Florida. (Id.) Claimant was oriented and there were no indications of hallucinations, delusions, or a psychotic process. (Id.) He had intermittent difficulties concentrating. (Id.) Dr. Richetta administered the BDI-II "to substantiate symptoms observed or described during the clinical interview rather than for diagnostic purposes." (Id.) Claimant scored a 30 indicating severe depression. (Id.) Dr. Richetta diagnosed Adjustment Disorder with Depressed Mood, Chronic (Tr. at 1251.); he attributed Claimant's mental impairment as a direct and proximate consequence of the 2013 work injury, and that Claimant would benefit from undergoing psychotherapy and a psychiatric medication consultation. (Tr. at 1252.)

On September 16, 2014, Claimant saw William S. Froilan, Ph.D., for an initial individual psychotherapy session in relation to his work-related injury. (Tr. at 1258.) Claimant reported concerns managing his anger and depression. (Id.) His mood was depressed with a blunted and depressed affect. (Id.) Two weeks later on September 30, 2014, during a follow-up session, Claimant reported concerns regarding management of his workers compensation claim. (Tr. at 1260.) He noted difficulty with ongoing pain and dysfunction. (Id.) He reported his mood was "more depressed," although Dr. Froilan observed a fuller range of affect than during his last session. (Id.)

22

On October 14, 2014, Claimant repeated his concerns regarding management of his workers compensation claim and associated frustration and depression. (Tr. at 1254.) Claimant acknowledged being in a slightly better mood recently given that he was planning to visit his daughter. (Id.) Dr. Froilan rated Claimant's prognosis as fair and his progress as improved. (Id.) By November 25, 2014, Claimant saw Dr. Froilan and endorsed worsened irritability. (Tr. at 1256.) He admitted that he screamed at his kids and wife all the time. (Id.) Dr. Froilan rated his prognosis as fair, but his progress as worsened. (Id.)

On January 6, 2015, Claimant told Dr. Froilan that he felt that he was "stuck in a loop and no one is letting me out" (Tr. at 1262.) Claimant stated that he experienced headaches thinking about his circumstances. (Id.) On examination, Claimant's mood was depressed with congruent affect, no change was noted in his progress. (Id.) On January 20, 2015, Claimant again reported feeling stuck and stated that he had things he wanted to do, such as visiting his friend in Florida, but he could not do it without his family helping him and they did "their own thing". (Tr. at 1264.) Dr. Froilan noted that his mood appeared depressed with a congruent affect. (Id.)

On February 11, 2015, Claimant returned to Dr. Froilan for a follow up regarding his "allowed psychological condition" and "again presented with continued frustration/depressed/anxious moods regarding his frustration feeling he is not being able to 'control' his circumstances regarding his claim process." (Tr. at 1266.) He reported feeling such anxiety that he "nearly had a stroke" very recently. (Id.) "He also has reported negative ruminative thinking amplifying his pain/headaches/increased blood pressure and vice versa." (Id.) Dr. Froilan rated Claimant's prognosis as "fair" and his progress as "worsened". (Id.)

On March 3, 2015, during a follow up with Dr. Froilan, Claimant's mood was dysphoric

with some moments of agitation and depressed mood. (Tr. at 1268.) He told Dr. Froilan that doing some things at home, such as sitting on his porch during good weather, helped him not to think about things. (Id.) Two weeks later, Claimant repeated his concerns regarding the claims process and contact with his former employer, and he described having a splitting headache. (Tr. at 1270.)

On April 28, 2015, Claimant saw Stephen W. Halmi, Psy.D., for a psychological evaluation at the request of the Ohio Bureau of Workers' Compensation. (Tr. at 1280-1289.) On examination, Claimant's speech was articulate and he spoke at a rapid rate and audible volume. (Tr. at 1285.) He gave well-organized, coherent, and relevant responses, although Dr. Halmi also stated that Claimant "was very difficult to interview because of his tangential response style." (Id.) Claimant's affect was broad and appropriate and he did not manifest any obvious signs of distress, depression, or mania. (Id.) Claimant reported feeling sad and down and being less interested in activities. (Id.) He stated that his workers' compensation claim was a source of his depression because they would not settle with him. (Tr. at 1286.) Claimant exhibited some signs of anxiety, such as rapid speech and psychomotor agitation. (Id.) Claimant was alert and oriented and he maintained adequate attention and concentration throughout the evaluation. (Id.) He could repeat five digits forward and three digits backward, but he made one error out of six subtractions on a serial seven subtraction task that began at 100. (Id.)

Claimant scored in the mildly impaired range on a calculation task and he scored in the low average range on a short-term memory task. (Tr. at 1287.) He could identify a contemporaneous news item, his last evening meal, and the most recent television show he watched. (Id.) His recall of remote personal dates and events was fair; he could identify the last three men who served as President; and he knew President Kennedy was assassinated. (Id.) Claimant scored in the severely

impaired range on an abstract reasoning task, but showed insight by acknowledging his psychological problems and need for continued mental health treatment. (Id.) He scored in the mildly impaired range on a judgment reasoning task that required him to provide solutions to hypothetical problem situations. (Id.) Dr. Halmi concluded that Claimant was capable of making reasonable decisions, living independently, and cooperating in treatment. (Id.)

Dr. Halmi opined that Claimant remained temporarily and totally disabled from working due to his Adjustment Disorder with Depression and that his symptoms of diminished initiative and motivation to engage in productive activities, chronic fatigue, and concentration problems prevented him from returning to work. (Tr. at 1288-1289.) He found that Claimant continued to manifest symptoms of depression and he could improve with continued psychotherapy with Dr. Froilan. (Tr. at 1288.) Dr. Halmi also opined that Claimant was not a viable candidate for vocational rehabilitation due to his depressive symptoms. (Tr. at 1289.) Dr. Halmi recommended that Claimant continue with individual psychotherapy treatment and that he needed to be evaluated by a medical provider to determine an appropriate antidepressant. (Id.) He also noted that Claimant's prognosis for making sustained change was poor and that his depression was rooted in chronic pain and physical restrictions. (Id.)

During a follow up with Dr. Froilan on April 28, 2015, Claimant continued to report frustration and depressed mood regarding his circumstances. (Tr. at 1338.) He expressed concern that he needed help and was seeking treatment for his injuries, but he did not feel it had been helped. (Id.) Claimant's mood was dysphoric and he manifested agitated and ruminative thinking. (Id.) Dr. Froilan discussed with Claimant how he did better when he spent time with his daughter or was otherwise focused on things other than his worries. (Id.)

25

On May 12, 2015, Claimant presented to Dr. Froilan in a calmer mood and talked about visiting his daughter and a friend in Florida, although he "continues to experience frustration and depressed mood regarding his circumstances, albeit to a lesser extent currently." (Tr. at 1346.) On May 26, 2015, Claimant's mood was again calmer, and he reported he had recently visited his daughter and hoped to make a family trip to Florida. (Tr. at 1354.) Dr. Froilan completed a treatment summary and opined that Claimant had moderate limitation in his activities of daily living, social function, concentration, persistence or pace, and adaptation. (Tr. at 1360.) He noted that Claimant was more consistently attending therapy sessions because his travels outside the United States to visit his daughter had decreased. (Id.) Dr. Froilan further noted that Claimant recently endorsed mild improvement in his condition, but he consistently complained of depressed mood (slightly improved), disturbance of sleep/appetite (status quo), poor concentration (mildly improved), poor energy (somewhat improved), social withdrawal (somewhat improved). (Id.) Dr. Froilan concluded that the overall degree of his anxious and depressed moods had lessened in degree. (Id.) Dr. Froilan also noted that Claimant was more oriented toward what he could do to help himself regarding his mood symptoms, and was increasingly more engaged in activities that gave him relief. (Id.) He gave Claimant's prognosis a fair rating, and his overall progress summary as "improving." (Id.)

On June 9, 2015, Claimant returned to Dr. Froilan for a follow up appointment and endorsed continued frustration, but his mood was calm and he had again recently traveled with his family. (Tr. at 1352.) On June 23, 2015, Claimant was again calm, although he reported to Dr. Froilan that he was "fed up" with his claim process. (Tr. at 1358.) Claimant stated that he had visited his daughter and he was hoping to make another trip to Florida. (Id.)

On January 20, 2016, Michelle Hudson, Psy.D. performed a neurobehavioral status examination on Claimant at his request.[8] (Tr. at 7-10.) Her behavioral observations were that Claimant was neat and clean and dressed appropriately. (Tr. at 9.) She also observed his gait was very slow and he had severe kyphosis, although he ambulated without an assistive device. (Id.) Dr. Hudson described Claimant as very verbose, tangential and laughed frequently. (Id.) His affect was euthymic and she noted that his insight appeared impaired. (Id.) Dr. Hudson administered an objective measure used to assess current psychological symptomatology (MMPI-2-RF) which indicated that Claimant responded to items in an inconsistent manner, therefore, his protocol was "considered invalid and uninterpretable." (Id.) She noted that "[t]his level of inconsistency is often associated with a non-cooperative test-taking approach." (Id.)

Dr. Hudson diagnosed Claimant with Post Concussion Syndrome (i.e., somatoform disorder); Depressive Disorder, NOS; and Anxiety Disorder, NOS. (Id.) Dr. Hudson recommended that: 1) Claimant should have an evaluation by a psychiatrist who specialized in psychotropic medication management of somatic complaints, depression and sleep disturbance; 2) Claimant was not an ideal candidate for individual psychotherapy due to inconsistent medical appointment attendance; and 3) she recommended that neuropsychological evaluation be postponed until Claimant was evaluated by a psychiatrist because Marshall University Psychiatry and Behavioral Medicine only accepted physician-based referrals. (Id.)

**The Administrative Hearing**

Claimant Testimony:[9]

---

[8] Claimant submitted this report directly to the Appeals Council.

[9] Claimant did not have representation during the administrative hearing, but elected to go forward with the proceedings because he "just lost my patience with all this stuff." (Tr. at 47-49.) It is noted that in response to inquiries

Claimant testified that although he has a driver's license, Dr. Ferguson advised him not to drive, but he still drives to make his appointments when his wife or other family member is unable to do so. (Tr. at 52-53.) He admitted that he tried driving a couple of times against doctor's orders, and he forgot how to get home. (Tr. at 63.) After his work-related injury, Claimant testified that he went back to work for a couple of months performing the same job for the same employer. (Tr. at 55.) He also worked for a couple of months in the fourth quarter of 2014 driving a truck. (Tr. at 56.)

Claimant testified that he could not work because he could not sit or stand; he had diabetes with nerve pain; and he took medication that affected his memory. (Tr. at 57.) Claimant had pain in his lower back, neck, knee, ankle, and hip. (<u>Id</u>.) He stated that his lower back pain in constant, for which he takes muscle relaxers and pain medication; he did not use any rubs, physical therapy or exercise for it. (Tr. at 58.) He stated that he had to quit physical therapy because he could not do the stretching exercises. (<u>Id</u>.) Claimant stated that Dr. Ferguson's office told him that he may need surgery eventually, but there was only a 50/50 chance it would help. (<u>Id</u>.) Due to his lower back pain, he had trouble walking, and could not walk a city block, but maybe half a block. (Tr. at 58-59.)

He testified that he could stand for 30 seconds, about as long as it takes him to make coffee, then he needs to sit down. (Tr. at 59.) Claimant thought he could sit for a minute or two, it depended upon the kind of chair he was in. (Tr. at 59-60.) Claimant testified that he could lift a gallon of milk, but he could not lift one in each hand. (Tr. at 60.)

With regard to his neck, Claimant testified that he has not had any treatment yet, although

<hr>

from the ALJ, Claimant received the information and acknowledged his right to have a representative appear on his behalf and assist him in his claim. (Tr. at 47-48.) Claimant did not want to postpone the hearing. (Tr. at 48.)

he had an x-ray of his neck that he said indicated it was straight when it was supposed to be curved. (Id.) In addition, Claimant stated that his right knee, ankle and hip were injured when he slipped and fell out of the back of the truck when he was securing a load. (Tr. at 61.) Claimant testified that his right hand shook, that was due to carpal tunnel; he planned to see a doctor about it later in the month. (Tr. at 62.) Claimant testified that he is right handed, and that he has "feelings" in his fingers that makes it difficult for him to grasp, therefore he uses his left hand. (Id.)

He also had headaches, and stated he had one during the hearing; he testified that they were triggered by stress and bright lights. (Tr. at 62-63.) Claimant stated that he took medication for his headaches, and that it puts him to sleep; he cannot take any medication during the day because he cannot function. (Tr. at 63.)

Claimant stated that he tries to mow the grass and weed eat, but it takes him "forever." (Id.) He used to love doing that kind of chore. (Id.) For household chores, he picks up and loads the dishwasher. (Id.)  He takes baths instead of showers because he cannot stand; he can dress himself and take care of his personal needs. (Tr. at 63-64.) He sleeps about four hours then he's up and he also naps during the day. (Tr. at 64.) To pass the time, he watches television, he does not have a favorite show, but will watch just about anything that is on. (Tr. at 64-65.) Claimant testified that he sometimes can follow what is going on in a television program. (Tr. at 65.)

Claimant testified that he does not belong to any social groups, he stopped going to church because he cannot get out of bed in the morning, both physically and mentally. (Id.)

Claimant was being seen Dr. Froilan in Ohio for mental health issues that workers' compensation ordered; he testified that he would like to continue seeing him but was unsure if the West Virginia medical card would permit him. (Tr. at 65-67.) Claimant indicated that he had more

29

recent records from Dr. Froilan that had not been submitted to SSA; more recent records from Dr. LeMaster would be requested as well. (Tr. at 67-68, 81-82.)

Claimant testified that he has diabetes, for which he takes medication to address the nerve pain in his feet. (Tr. at 69.) Claimant also stated that he had sleep apnea, but did not have a CPAP or BiPAP machine, but had a study on it coming up in November. (Tr. at 70.)

Claimant stated that he is 5'8" tall and weighed about 200 pounds. (Id.)

Amy Tomblin Testimony:

Mrs. Tomblin had been married to Claimant for 17 years and resided with him. (Tr. at 72.) She testified that Claimant was unable to do things he used to, such as cut grass, keep up the house, fix things or drive. (Id.) She was present when a doctor told Claimant not to drive this was shortly after he fell out of the truck while at work. (Tr. at 72-73.) Mrs. Tomblin testified that Claimant was cranky because he was not working and being home all the time. (Tr. at 73.) She stated that he does not have much patience and that little things get on his nerves. (Id.) Since 2013, Mrs. Tomblin has to do things Claimant would have done, like trying to upkeep the house, clean the dryer lint out because Claimant is unable to bend down and get to it. (Tr. at 74.) She stated that Claimant still tends to his personal hygiene. (Id.) Mrs. Tomblin testified that Claimant is unable to stay the entire duration of their kids' sporting games. (Tr. at 75.)

Gina Baldwin, Vocational Expert ("VE") Testimony:

The VE testified that Claimant's past relevant work as a truck driver was medium exertional level as performed, and semi-skilled. (Tr. at 79.) Given the hypothetical individual with limitations to medium level work who could occasionally climb, frequently balance, stoop, kneel, crouch and crawl, avoid concentrated exposure to temperature extremes, wetness, vibration and

hazards, who can finger frequently with the right dominant hand, and who can understand, remember and carry out simple instructions, the VE responded that the individual could not perform Claimant's past relevant work. (Tr. at 79-80.) The VE further testified that there were no transferrable skills within that hypothetical, however, considering Claimant's age, education and work history, there were other jobs the individual could perform, such as store laborer and sorter, unskilled at the medium work classification, and assembler and price marker at the light work classification, and table worker and final assembler at the sedentary work classification. (Tr. at 80.) Further limiting the individual to never climbing ladders, ropes or scaffolds, and avoiding even occasional exposure to hazards, the VE testified those addition limitations would have no impact on the jobs she listed. (Tr. at 80-81.) However, if the individual were to be off task for 20 percent of the workday, then no jobs would exist. (Tr. at 81.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape

their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

**<u>Analysis</u>**

As stated previously, Claimant argues that the ALJ committed reversible error when she discounted the opinion evidence provided by Dr. Halmi where she found it was based on Claimant's subjective complaints, and that the ALJ failed to consider all the medical opinion evidence, especially those regarding his mental impairments that affected his functioning, and that such limitations were not adequately reflected in the RFC. (Document No. 14 at 6.)

<u>Evaluating Opinion Evidence:</u>

Pertinent to the case at bar, 20 C.F.R. §§ 404.1504 and 416.904 provide that:

> [a] decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency [e.g., Workers' Compensation, the Department of Veterans Affairs, or an insurance company] that you are disabled or blind is not binding on us.

Social Security Ruling, SSR 06-3p, 71 FR 45593-03, at *45596. However, the Ruling makes clear that the "evidence used to make these decisions[] may provide insight into the individual's mental and physical impairment . . . [w]e will evaluate the opinion evidence from medical sources who have had contact with the individual in their professional capacity, used by other agencies . . . in accordance with 20 CFR 404.1527, 416.927[.]"

Sections 404.1527 and 416.927 govern the SSA's criteria for evaluating opinion evidence; per §§ 404.1527(a)(2), 416.927(a)(2):

> Evidence that you submit or that we obtain may contain medical opinions. Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994). The Regulations provide that an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors.

Under §§ 404.1527(c)(1) and 416.927(c)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(c)(3) and (4) and 416.927(c)(3) and (4) address the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given) and consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of State agency medical and psychological consultants, or other medical specialists. See 20 C.F.R. §§ 404.1527(e)(2)(ii) and 416.927(e)(2)(ii). However, the ALJ is not bound by any findings made by these sources. 20 C.F.R. §§ 404.1527(e)(2)(i) and 416.927(e)(2)(i).

In this case, the ALJ acknowledged that Dr. Halmi performed a consultative exam in April

2015 for which Claimant presented "with complaints of adjustment disorder with depression as a result of his physical conditions." (Tr. at 33.) The ALJ noted that during the exam, Claimant "reported that he was able to complete his daily hygiene activities and simple household chores" as well as "attend church on occasion." (Id.) Moreover, "[t]he examiner noted [Claimant] ambulated in a forward-leaning posture at a slow pace and he utilized a cane; he was restless and fidgety but not excessive pain behavior or exaggerated signs of psychopathy were noted." (Id.) The ALJ further noted that "the examiner opined the claimant was not a[t] maximum medical improvement a[t] that time but that his depression might improve with therapy and medication[]" and that Dr. Halmi found Claimant's "depression was rooted in chronic pain and that he would likely remain somewhat depressed because of having to live with chronic pain (Exhibit 31F)." (Id.) Regarding Dr. Halmi's opinion that Claimant was temporarily and totally disabled, the ALJ took note that Dr. Halmi found Claimant experienced "diminished initiative and motivation to engage in productive activities; chronic fatigue; and concentration problems that would prevent him from returning to the workforce (Exhibit 31F page 10)." (Tr. at 35.) Ultimately, the ALJ assigned Dr. Halmi's opinion "little weight since it is based upon the claimant's subjective complaints and is inconsistent with the overall medical record. In addition, TTD is not an acceptable SSA term."[10] (Id.)

The ALJ recognized that Dr. Halmi performed a "consultative exam" in April 2015; there was no evidence that Dr. Halmi was Claimant's treating physician, only that he was a one-time examiner in relation to Claimant's workers' compensation claim. Where the ALJ noted that

---

[10] In addition, the ALJ noted that Dr. Halmi's opinion that Claimant was "temporarily and totally disabled (TTD) from working due to adjustment disorder with depression" was not entitled to controlling weight as this opinion concerned Claimant's disabled status, and such opinions are reserved to the Commissioner. (Tr. at 35.) Neither Claimant nor the Commissioner contest this point, however, and Claimant conceded such determinations are within the Commissioner's province. (Document No. 14 at 7; Document No. 17 at 16.)

Claimant was seen for a consultative examination with "Stephen Halmi, Psy.D." that followed her discussion of the evidence relating to his "mental health issues" (Tr. at 33.), the ALJ was ostensibly aware of Dr. Halmi's specialty though not explicitly mentioned in her decision. With regard to the ALJ's finding Dr. Halmi's opinion was unsupported by the overall medical evidence of record, again, this assessment was made after her recitation of the evidence relating to Claimant's mental health treatment:

First, the ALJ noted that in April 2014, Claimant presented to Raymond Richetta, Ph.D. with complaints of depression secondary to his physical conditions, which caused Claimant frequent irritability and depression and increased drinking, however, he was not in treatment for these issues at the time. (Id.) Dr. Richetta assessed Claimant with adjustment disorder with depressed mood due to his 2013 injury, which caused his sadness, worry, irritable mood, "and reduced concentration, as well as very low stress tolerance, reduced energy, and insomnia." (Id.) Next, the ALJ noted Claimant began treatment for his adjustment disorder and depression with Weinstein & Associates[11] and that "[h]e continued to follow up sporadically over the intervening months for conservative treatment of his depressed mood." (Id.) Specifically, the ALJ cited a visit in May 2015 when Claimant "reported that he would be able to attend more consistently as his travels outside the United States to visit his daughter would now decrease." (Id.) Additionally, the ALJ noted that Claimant "also reported a mild improvement in his psychological condition (Exhibit 37F page 26)." (Id.; Tr. at 1360.)

From the aforementioned, it does not appear that the ALJ committed error in her evaluation of Dr. Halmi's opinion evidence, as she considered it pursuant to the Regulations and provided

---

[11] The undersigned notes this is where Claimant received treatment from psychologist William Froilan, Ph.D. in connection with his workers' compensation claim.

specific reasons for the "little weight". Despite Claimant's contention that Dr. Halmi's opinion shares "quite a bit of consistency" with Dr. Hudson's opinion, Dr. Hudson's opinion was not part of the record at the time the ALJ issued her decision, and Claimant has not argued that Dr. Hudson's observations are "new" and "material" evidence that would have changed the outcome in this proceeding. Wilkins v. Secretary, Dept. of Health and Human Services, 953 F.2d 93 (4th Cir. 1991). Indeed, the Appeals Council considered the evidence from Dr. Hudson, but ultimately found that it did not consist of new and material evidence necessitating a change in the ALJ's decision. (Tr. at 1-2.) Accordingly, the undersigned **FINDS** that the ALJ's evaluation of Dr. Halmi's opinion is supported by substantial evidence.

With respect to Claimant's argument that the ALJ did not address Dr. Richetta's opinion (Document No. 14 at 8.), it is noted that Dr. Richetta, like Dr. Halmi, was a one-time examiner who provided a psychological evaluation in connection to Claimant's workers' compensation claim. (Tr. at 1246-1252.) As noted *supra*[12], this opinion was rendered before Dr. Halmi's opinion, and prior to the Ohio Bureau of Workers' Compensation allowing Claimant's claim for mental impairment. (Tr. at 1246.) Dr. Richetta's opinion did not differ much, if at all, from the other one-time examiner psychological opinion evidence, and this consistency is important insofar as Dr. Richetta's opinion does little more than corroborate the opinions provided by Drs. Halmi and Hudson, therefore, the ALJ's failure to expressly assign this opinion weight is harmless error at most. See Tanner v. Comm'r of Soc. Sec., 602 F.App'x 95, 101 (4th Cir. 20015). An ALJ need not discuss every piece of evidence, because the issue before the Court is whether the ALJ's decision is supported by substantial evidence, not if she mentioned a particular piece of evidence. See, e.g., Grubby v.

---

[12] See page 22 of this Proposed Findings and Recommendation.

Astrue, 2010 WL 5553677, at *6-7 (W.D.N.C. Nov. 18, 2010); Dyer v. Barnhart, 395 F.3d 1206 (11th Cir. 2005); Young v. Apfel, 221 F.3d 1065 (8th Cir. 2000). From that perspective, the ALJ did not err by failing to mention all the medical source statements. In addition, the ALJ's failure to assign a weight value to Dr. Richetta's opinion was harmless error, as Claimant has not demonstrated any prejudice from this oversight. Shineski v. Sanders, 556 U.S. 396, 409 (2009).Therefore, the undersigned **FINDS** that Claimant's argument that the ALJ's decision is unsupported by substantial evidence due to her failure to address Dr. Richetta's opinion evidence lacks merit.

Nevertheless, to the extent that the ALJ failed to address Claimant's treating psychologist's opinion(s), the undersigned agrees with Claimant that this omission constitutes reversible error. Of interest here, the ALJ never referred to Claimant's treating psychologist, Dr. William Froilan, by name, and even referred to him only as "[a]n examiner". (Tr. at 34.) The record shows that Claimant received psychotherapy from Dr. Froilan for well over one year, with another treatment session scheduled for October 27, 2015, after the administrative hearing. (Tr. at 1385.) This suggests that the ALJ did not fully appreciate Dr. Froilan's treating relationship with Claimant, who could have provided the "detailed, longitudinal picture" of Claimant's mental impairments more adequately than the opinions from the one-time examiners who received greater attention from the ALJ in her written decision. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Moreover, throughout Claimant's treatment, Dr. Froilan submitted numerous opinions regarding Claimant's progress, prognosis, and more importantly, assessments concerning Claimant's limitations in the three broad

areas of functioning.[13] (Tr. at 1275-1276, 1277-1278, 1370-1371, 1372-1373, 1374-1375.) However, at no time did the ALJ address these medical source statements, despite the fact that Dr. Froilan was the <u>only</u> <u>treating</u> mental health specialist of record. Despite the Commissioner's insistence that the ALJ evaluated "the same form completed by Dr. Wilcox" with respect to Claimant's limitations in the three broad areas of functioning (Document No. 17 at 20.), as noted *supra*[14], the record is clear that Dr. Wilcox neither evaluated Claimant for mental impairments, nor was he treating the Claimant for mental claims. Therefore, the Commissioner's argument that Dr. Wilcox's opinion is somehow equivalent or substitute for Dr. Froilan's is unpersuasive. Accordingly, the undersigned **FINDS** that the ALJ's decision is not supported by substantial evidence with respect to its silence concerning Claimant's treating psychologist's opinion(s).

<u>The RFC Assessment:</u>

Residual functional capacity represents the *most* that an individual can do despite his limitations or restrictions. <u>See</u> Social Security Ruling 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC determination is an issue reserved to the Commissioner. <u>See</u> <u>Id</u>. §§ 404.1527(d), 416.927(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA

---

[13] Specifically, these forms provide assessments for "activities of daily living", "social functioning", "concentration, persistence and pace", and "adaptation", with degrees of limitations for each, including, "none", "mild", "moderate", "marked", and "extreme".
[14] See footnote 6, page 9 of this Proposed Findings and Recommendation.

need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

With respect to Claimant's argument that the ALJ did not adequately address Claimant's mental limitations in her RFC assessment (Document No. 14 at 8-9.), the undersigned notes that the ALJ found Claimant's concentration, persistence or pace moderately limited due to Claimant's allegations that he no longer drives due to his difficulties with concentrating and focusing. (Tr. at 27.) In addition, the ALJ noted that Claimant alleged that there "are many occasions that he is unable to focus and concentrate well enough to complete the tasks at hand." (Id.) Further, the ALJ noted that Claimant took medication for his migraine headaches, but it made him drowsy and affected his concentration. (Tr. at 29.) Additionally, Claimant took medication for his diabetic neuropathy that also affected his concentration and focus. (Id.) Claimant's mental health issues were found to be the result of not being able to work, which also affected his concentration and focus. (Id.) As mentioned *supra*, at no time did the ALJ address Dr. Froilan's opinions regarding Claimant's level of functioning with respect to his activities of daily living, social functioning, or concentration, persistence or pace. The Commissioner contends that Dr. Froilan's assessments were only applicable for specific time periods (Document No. 17 at 20.), however she fails to recognize that Dr. Froilan submitted more than two medical source statements, as noted *supra*[15], and further, Dr. Froilan indicated a worsening of Claimant's psychological condition from September 2014 to January 2015. (Tr. at 1273, 1275.) At minimum, the ALJ had a duty to reconcile this conflict in the evidence.

---

[15] See page 37 of this Proposed Findings and Recommendation.

Finally, the undersigned is at pains to determine how the ALJ arrived at her conclusions in her RFC assessment, despite the Commissioner's argument that the ALJ accounted for Claimant's mental function limitations by limiting him to work that required him to "understand, remember, and carry out simple instructions." (Document No. 17 at 19.) The ALJ stated:

> The undersigned gives only slight weight to the opinions of Marshall Health, Dr. Cremer, Ms. Fields, and the Workers' Compensation examiner. It appears in some instances that the examiners relied primarily on the claimant's subjective reports of symptoms, which are not documented in his longitudinal treatment records. Nevertheless, the undersigned does give these opinions some weight in finding the claimant . . . can understand, remember, and carry out simple instructions.

(Tr. at 35.) The Marshall Health opinion was that Claimant should not drive due to his episodes of "cognitive fog" that was cited by the ALJ as "Exhibit 26F page 8". (Tr. at 35, 1214.) There is nothing in that document that provided for Claimant's limitations to understanding, remembering, and carrying out simple instructions. Dr. Cremer's opinion pertained to Claimant's physical limitations only, and was cited by the ALJ as "Exhibit 33F page 6", but more importantly, it did not indicate that Claimant was limited to understanding, remembering, and carrying out simple instructions. (Tr. at 35, 1291-1296.) Ms. Fields's opinion was a one page document, Exhibit 32F, that provided for several restrictions, including that Claimant should avoid activity that would injure himself or others, as well as avoid driving, due to his episodes of loss of consciousness, and more importantly, it did not indicate that Claimant was limited to understanding, remembering, and carrying out simple instructions. (Tr. at 35, 1290.) Lastly, the 2013 Workers' Compensation assessment, cited as "Exhibit 7F page 62" (Tr. at 35, 743.) provided the restrictions detailed by the ALJ, however, it too, did not indicate that Claimant was limited to understanding, remembering, and carrying out simple instructions.

In sum, the ALJ's accommodation for the limitations caused by Claimant's severe mental impairment is not based on any opinion provided by those referenced sources. Though the Regulations provide that the RFC assessment is only for the Commissioner's determination, she is also charged with reviewing the "***relevant*** evidence" for determining the particular types of work a claimant may be able to do despite his impairments. <u>See</u> 20 C.F.R. §§ 404.1545(a), 416.945(a) (emphasis added). There is no question that the evidence referenced in support of the RFC determination is irrelevant, and further, due to the ALJ's failure to consider the opinion evidence provided by Claimant's treating psychologist as discussed supra, the undersigned **FINDS** the RFC determination with respect to Claimant's mental impairments is not supported by substantial evidence.

Claimant argued that the RFC determination was also inadequate with respect to his mild carpal tunnel syndrome on the right (Tr. at 1042.) where the ALJ determined that he "can finger frequently with the right dominant hand". (Tr. at 28; Document No. 14 at 9.) However, despite the nerve conduction studies indicating "mild severity" in his right side, with "no additional evidence of radiculopathy (C5-T1 myotomes), plexopathy, neuropathy or additional sites of nerve entrapment" (Tr. at 1048.), there was no additional medical source evidence that demonstrated significant restrictions to Claimant's right hand and wrist. Claimant does not demonstrate any prejudice with respect to this limitation in his RFC assessment, as the medical evidence of record does not provide for any necessary restrictions with respect to his mild right sided carpal tunnel syndrome. Accordingly, the undersigned **FINDS** this limited argument lacks merit.

**Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's Motion for Judgment on the Pleadings (Document No. 14.) to the extent that the ALJ did not properly consider the opinion evidence from Claimant's treating psychologist during the sequential evaluation process, **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 17.), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings for the reasons stated above.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933

(1986); <u>Wright v. Collins</u>, 766 F.2d 841 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: March 16, 2017.

Omar J. Aboulhosn
United States Magistrate Judge